**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BOYING GUO,**<br><br>**PLAINTIFF,**<br>**v.**<br><br>**JANSSEN RESEARCH & DEVELOPMENT, LLC,**<br><br>**and**<br><br>**JUSTIN CISAR,**<br><br>**DEFENDANTS.** | **Civil Action No.: ____________**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

Plaintiff Boying Guo, by and through his undersigned attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1. This is an action for an award of damages, punitive damages, and other relief on behalf of Plaintiff Dr. Boying Guo (hereinafter "Dr. Guo" or "Plaintiff"), a former employee of Janssen Research & Development, LLC (hereinafter "Janssen")[1] who was supervised in his position by Defendant Justin Cisar. Dr. Guo has been harmed by Janssen's harassment and discrimination on the basis of his race and national origin and by Janssen's retaliation against him for complaining about harassment and discrimination, culminating in his wrongful

[1] During the administrative process with the EEOC, Defendant indicated that the correct legal entity that acted as Plaintiff's employer is Janssen Research & Development, LLC. Dr. Guo named Johnson & Johnson, which is the company name listed in various documents relating to his employment. Based on the representation by Defendant in its submissions to the EEOC, Dr. Guo has named Janssen Research & Development, LLC.

termination on April 4, 2025. Defendant Justin Cisar aided and abetted Janssen's discrimination, harassment and retaliation as set forth herein.

2. This action is filed pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C § 2000(e) et seq. ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA").

## JURISDICTION

3. This Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5. This Court has supplemental jurisdiction over any Pennsylvania state law claims alleged herein pursuant to 28 U.S.C. § 1367.

6. All conditions precedent to the institution of this suit have been fulfilled. On September 19, 2025, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Pennsylvania Human Relations Commission ("PHRC") and assigned EEOC Charge Number 530-2025-10244. On August 6, 2026, the EEOC issued a Notice of Right to Sue to Plaintiff. This action has been filed within ninety (90) days of Plaintiff's receipt of said Notice. With respect to the PHRA claims herein, it has been greater than one year since Plaintiff dual-filed his Charge as a Complaint with the PHRC.

**VENUE**

7. This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

8. This action properly lies in the Eastern District of Pennsylvania because significant activities associated with the claims alleged took place in this judicial district, Plaintiff performed his work for Defendant Janssen in this judicial district, Plaintiff was terminated in this judicial district, and the claims arose in this judicial district.

**PARTIES**

9. Plaintiff Boying Guo is an adult Chinese-American male citizen and resident of Warrington, Pennsylvania and the United States of America.

10. Defendant Janssen is a pharmaceutical corporation with its headquarters at One Johnson & Johnson Plaza, New Brunswick, NJ 08933, and operating numerous offices, including 1400 McKean Road, Lower Gwynedd Township, PA 19002, where Plaintiff was employed.

11. Defendant Justin Cisar is, upon information and belief, a citizen and resident of North Wales, Pennsylvania and the United States of America.

12. Defendant Cisar supervised Dr. Guo and aided and abetted Defendant Janssen's discrimination, harassment and retaliation as alleged herein.

13. At all relevant times, Defendant Janssen is and has been an employer employing more than five hundred (500) employees.

14. At all relevant times, employees of Defendant Janssen acted as agents and servants for Defendant Janssen.

15. At all relevant times, employees of Defendant Janssen were acting within the scope of their authority and in the course of employment under the direct control of Defendant Janssen.

16. At all times material hereto, Defendant Janssen acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Defendant Janssen and in furtherance of Defendant Janssen's business.

17. This cause of action arose out of transactions or occurrences that took place in whole or in part in Montgomery County, Pennsylvania.

18. Defendant Janssen conducts substantial business within Montgomery County, Pennsylvania.

19. This Honorable Court has personal jurisdiction over the Defendants.

## FACTS

20. In or about 2019, Dr. Guo began his employment with Janssen as a Senior Scientist at the Research and Development location in Spring House, Pennsylvania.

21. Throughout his employment, Dr. Guo was a dedicated and exemplary employee, and performed his duties in an exceptional and diligent manner.

22. However, over the course of his employment, Dr. Guo observed that the company engaged in a pattern and practice of discrimination against Asian and Chinese employees, such as himself.

23. On or about February 20, 2025, Dr. Guo's manager, Defendant Justin Cisar, Senior Manager, Global Discovery Chemistry, called Dr. Guo into his office for a meeting.

24. The purpose of the meeting was to discuss Dr. Guo's annual compensation, and while reviewing his compensation, Dr. Guo noticed a reduction in his bonus from six (6) percent to five (5) percent.

25. Dr. Guo asked Dr. Cisar to provide an explanation for the deduction, but Dr. Cisar only responded that Dr. Guo could ask Human Resources ("HR") and the Senior Team Leader.

26. When Dr. Guo reasoned that as his manager, Dr. Cisar could likely explain the deduction, Dr. Cisar grew irate, opened the door to his office, and told Dr. Guo to "go away."

27. That same day, Dr. Guo reached out to HR, and requested information about the reduction in his bonus.

28. Dr. Guo was then informed that his manager, Dr. Cisar, is the one who decides the merit of his bonus.

29. Dr. Guo captured this conversation and sent a screenshot of the guidance he had received to Dr. Cisar, again asking for an explanation, and copying Andrew Peat, the department head.

30. However, Dr. Cisar refused to provide any further information about the reason for the reduction in Dr. Guo's bonus.

31. This was not the first time that Dr. Guo was subjected to differential treatment.

32. Dr. Cisar had a history of making harassing comments to Dr. Guo and preventing him from advancing in his career.

33. On or about September 10, 2024, during a one-on-one monthly meeting between Dr. Guo and Dr. Cisar focusing on Dr. Guo's career development, Dr. Cisar threatened that Dr. Guo would not receive a promotion for 20 years.

34. Dr. Cisar further stated that Dr. Guo talking about his situation with senior leadership, including the Business Unit Vice President, would not help him.

35. Following this, Dr. Cisar cancelled all further career development related one-on-one meetings with Dr. Guo.

36. Dr. Guo was also the only Scientist who had not received a promotion since 2019 and received no opportunities for growth.

37. He was not invited to increase his departmental responsibilities and was excluded from events, committees, and other activities despite his exemplary performance.

38. When Dr. Guo reached out to the Department Head, Mr. Peat, regarding potential opportunities for career development, Mr. Peat responded that "opportunities in this department (medicinal chemistry) were given."

39. As a result of these actions and Dr. Cisar's harassing comments, it became clear to Dr. Guo that Dr. Cisar held a discriminatory animus against him on the basis of his race and national origin.

40. This was especially evident in light of the pattern in Dr. Guo's unit with respect to Asian and Chinese individuals.

41. Specifically, two other Chinese scientists in Dr. Guo's unit had recently been terminated.

42. As a result of the foregoing treatment, Dr. Guo filed an official complaint and opened a case with Janssen's Employee Relations ("ER") team on February 20, 2025.

43. Dr. Guo specifically stated in his complaint that he was experiencing discrimination and retaliation.

44. Dr. Guo was swiftly and immediately subjected to retaliation following his complaint.

45. The very next day, February 21, 2025, Dr. Cisar threatened to terminate Dr. Guo's employment because he had raised concerns about discrimination with HR and senior leaders.

46. Dr. Guo subsequently filed another complaint that day, on February 21, 2025, explicitly stating that Dr. Cisar's threat of termination was an obvious act of retaliation and that he was being further discriminated against.

47. Later that same day, Mr. Peat met with Dr. Guo.

48. During the virtual meeting, Mr. Peat stated to Dr. Guo that this meeting was "not to discuss details, but to let you know what we are planning to do next."

49. After the meeting, Mr. Peat sent an email to Dr. Guo, copying Dr. Cisar and an ER representative, Janeen Wallace, to summarize their conversation.

50. Mr. Peat additionally let Dr. Guo know that he would work with Dr. Cisar and Ms. Wallace to set up a meeting.

51. However, after hearing nothing, Dr. Guo filed another complaint on or about February 24, 2025.

52. Dr. Guo reiterated that Dr. Cisar was threatening to terminate him and asked for information on the procedure at Janssen for termination.

53. Three days later, on or about February 27, 2025, Dr. Cisar sent Dr. Guo a meeting invitation for the following day, February 28, 2025, to discuss how to move forward.

54. Dr. Guo noticed that Ms. Wallace had not been invited to the meeting.

55. When Dr. Guo asked Dr. Cisar why Ms. Wallace was not going to be a part of the meeting, Dr. Cisar responded that "this was JNJ policy."

56. On February 28, 2025, Dr. Guo attended the meeting with Dr. Cisar, wherein Mr. Peat was also present.

57. At the outset of the meeting, Dr. Cisar told Dr. Guo that he was being issued a Corrective Action Plan ("CAP" or "warning letter") and being placed on a Performance Improvement Plan ("PIP"), in blatant retaliation for his complaints.

58. Dr. Cisar proceeded to inform Dr. Guo that this meeting was not intended to discuss the CAP and PIP documents but rather for Dr. Guo to sign them.

59. The warning letter signed by Dr. Cisar quoted the subject matter of Dr. Guo's internal complaint as misconduct.

60. Dr. Cisar also told Dr. Guo that these documents were the result of a "thorough investigation" executed by HR and had been approved by HR.

61. Dr. Guo asked Mr. Peat if he had also reviewed the documents and approved them, and Mr. Peat said that he had.

62. Dr. Cisar then repeated to Dr. Guo that he was expected to sign the CAP and PIP right then and there.

63. Dr. Guo declined to sign the documents, saying that he needed some time to digest them.

64. Later that day, Dr. Cisar sent another meeting invitation to discuss the deliverables and outcomes of the PIP. Dr. Guo declined the meeting invitation as he needed more clarification as to why these documents had been approved, when he believed the CAP and PIP were issued in retaliation for his complaints of discrimination, harassment and retaliation.

65. It is plain that these documents were indeed retaliatory in nature as Dr. Guo had never been informed of any concerns with his performance prior to his filing complaints of discrimination and the subsequent issuance of the CAP and PIP.

66. Additionally, Dr. Guo had never been contacted in regard to any investigation into his performance or otherwise.

67. In fact, although Dr. Cisar had previously given Dr. Guo a "Moderate" performance rating the prior year, on or about January 4, 2025, Dr. Cisar specifically informed Dr. Guo at the time that the rating should not be of any concern and that it did not necessitate any corrective or other action.

68. Additionally, Dr. Guo had expressed concern at his performance rating because Dr. Cisar had issued Dr. Guo two "Moderate" ratings since 2023, and Dr. Guo had been told that two continuous "Moderate" ratings could result in termination.

69. However, in response, Dr. Cisar told Dr. Guo, "No, you are safe. Your behavior and accomplishments were above average and beyond the position requirements as a Senior Scientist."

70. Consequently, on February 28, 2025, Dr. Guo submitted another complaint stating that the CAP and PIP were retaliatory actions in response to his complaints that he was being subjected to discrimination, harassment and retaliation.

71. Dr. Guo stated that he especially believed that the PIP was retaliatory given that it included impossible goals and objectives, clearly attempting to set Dr. Guo up for failure and possible termination rather than a genuine effort for Dr. Guo to improve his performance.

72. On or about March 2, 2025, Dr. Guo emailed the Business Unit Human Resources Representative, Kathleen Hall, to request clarification on the issuance of the CAP and to determine to what extent HR had been involved in the process.

73. Dr. Guo also relayed to Ms. Hall that he believed that the CAP was not truly indicative of his performance, but rather that the letter was issued as a form of retaliation for his complaints of discrimination, harassment and retaliation.

74. Ms. Hall responded the next day, March 3, 2025, and stated that she had reached out to the Employee Relations team to investigate the situation.

75. Dr. Guo responded to Ms. Hall to express the urgency of the situation and reiterated that he believed the CAP and PIP were acts of retaliation.

76. Following the February 28, 2025, meeting, Dr. Cisar continually pressured Dr. Guo to accept and comply with the PIP.

77. Dr. Guo informed Dr. Cisar that he believed that the tasks in his PIP were unachievable and requested that they discuss more realistic expectations for the outcomes and goals.

78. However, Dr. Cisar refused to listen to Dr. Guo or engage in any efforts to collaborate with Dr. Guo to arrive at more attainable objectives.

79. Instead, Dr. Cisar continued to pressure Dr. Guo to sign the PIP, even sending emails after business hours.

80. On or about March 4, 2025, Dr. Guo emailed Dr. Cisar with information on his progress with the February 2025 goals and objectives and his updated goals for March 2025.

81. In the same email, Dr. Guo relayed the negative impact the unexpected PIP was having on his mental health. Dr. Guo explained that the PIP was causing him severe anxiety,

affecting his ability to sleep at night, and creating a constant sense of uncertainty and undue pressure.

82. Dr. Guo stated that as a result, he had sought professional help and was planning to meet with a psychiatrist.

83. Later that day, Dr. Guo also emailed Ms. Hall to ask for clarification regarding the process of his CAP and the HR investigation that led to the issuance of the letter.

84. Specifically, Dr. Guo asked whether HR had reviewed and approved the letter, what company policies governed the decision to issue the letter, and to whom he could escalate his concerns if he believed the process was unfair.

85. On March 4, 2025, Laura Whitehead, Employee and Labor Relations Manager contacted Dr. Guo to schedule a virtual meeting to discuss his matter.

86. Subsequently, the next day, on or about March 5, 2025, Dr. Guo spoke Ms. Whitehead to discuss Dr. Guo's complaints of discrimination, harassment and retaliation.

87. It became clear from Dr. Guo's conversation with Ms. Whitehead, however, that she was unaware of the existence of the CAP and PIP – despite Dr. Cisar's previous representations that the PIP had been "based on a thorough HR investigation and approved by HR."

88. The meeting was essentially a fact-finding conversation.

89. Also on or about March 5, 2025, Dr. Guo noticed that his name had been removed from a project assignment in another act of retaliation.

90. Dr. Guo emailed Dr. Cisar to ask why his name had been excluded from the project. Dr. Cisar responded with a revised PIP that reflected Dr. Guo's achievements from February.

91. He denied that Dr. Guo had been excluded from the project.

92. Dr. Cisar then told Dr. Guo to let him know what roles Dr. Guo would play and that he would add this information to the team goal tracker.

93. Later on March 5, 2025, Dr. Guo emailed Ms. Hall again to follow up on his email from the day before. Dr. Guo requested additional information regarding the fairness of the process, including whether the investigation that HR had conducted had been independent, why he had not been interviewed as part of the investigation, and whether the CAP could be considered retaliatory.

94. He additionally asked about how to appeal the decision, the reason as to why he had been removed from projects and its connection to the PIP and CAP, and whether the after-business-hours communication from Dr. Cisar was connected to the PIP and CAP.

95. Ms. Hall directed Dr. Guo to discuss his questions and concerns with Ms. Whitehead instead.

96. On March 6, 2025, Dr. Guo responded to Ms. Hall that he had ascertained from his conversation with Ms. Whitehead that she had not yet seen the CAP or PIP.

97. This raised additional concerns for Dr. Guo regarding the transparency and proper handling of the situation.

98. Dr. Guo therefore requested clarification on who had been involved in the investigation and decision-making process, why ER had not been fully briefed on the situation, and what the proper procedure was to respond to the letter.

99. Dr. Guo also again relayed to Ms. Hall that he believed the PIP to be retaliatory in nature.

100. In a later email to Ms. Hall, Dr. Guo asked for clarification into the status of his CAP and PIP, the role of ER in this process, and a timeline for when he could expect a response.

101. Following this email, Ms. Whitehead messaged Dr. Guo and told him that he was to communicate with her, and only her, regarding this matter, and that even if Dr. Guo escalated his complaint, the case would still be "owned" by Ms. Whitehead.

102. Dr. Guo then asked Ms. Whitehead if she had suggestions for how he should handle the PIP while the investigation into his complaint was ongoing.

103. Ms. Whitehead stated that he should meet with his manager and share his concerns during such meetings.

104. Dr. Guo asked for clarification of Ms. Wallace's role in the investigation of his case and whether he could learn who at HR had conducted the investigation into his performance that resulted in the PIP.

105. Ms. Whitehead stated that she would see if she could learn this information through her investigation.

106. On or about March 6, 2025, Dr. Guo reported his situation by email to the Janssen Ethics Committee and expressed his serious concerns about retaliation by Dr. Cisar, silence from senior management and Mr. Peat, and silence or delayed response by HR, Employee Relations, Ms. Hall and Ms. Whitehead.

107. On March 7, 2025, Dr. Cisar emailed Dr. Guo to inform him that the CAP was rescinded. Dr. Cisar stated that the information in the CAP would instead be incorporated into a revised PIP.

108. On or about March 10, 2025, Dr. Cisar emailed Dr. Guo to discuss the deliverables and outcomes of the PIP.

109. Dr. Guo declined the invitations to discuss the PIP as he continued to view the PIP as retaliatory conduct.

110. Then, Dr. Cisar emailed Dr. Guo and threatened that he may be placed on a CAP or that his employment may be terminated if he continued to decline to attend the discussion.

111. Due to the threat of termination, Dr. Guo attended the PIP meeting.

112. Prior to the meeting, Dr. Guo emailed HR a statement that his attendance at this meeting was not voluntary, but rather was under duress and a direct threat from his manager that his employment may be terminated if he did not participate.

113. Dr. Guo further reported the threatening behavior by Dr. Cisar by calling the Janssen hotline and expressed concerns that he would be fired immediately.

114. Dr. Guo was informed by the company representative he spoke to that an independent investigation would be initiated right away and that he would be updated with the results in seven to ten business days.

115. Dr. Guo also formally challenged the PIP as a retaliatory action for his complaints of discrimination and harassment via sending a formal request by email and certified mail to the HR Business Unit.

116. That same day, on or about March 10, 2025, Dr. Guo met with Ms. Wallace who confirmed that she approved the rescission of the original CAP.

117. However, she refused to explain the criteria and reasons under which the CAP was rescinded.

118. Ms. Wallace also indicated that issuance of the PIP and CAP were “based on your manager’s experience”.

119. Dr. Guo informed Ms. Wallace that the PIP was under investigation as retaliatory conduct. In response, Ms. Wallace stated that the PIP can be executed in parallel with its investigation and that his PIP was active.

120. On March 12, 2025, Dr. Guo emailed Ms. Wallace, and copied Steven McIntosh, Ms. Wallace's supervisor.

121. In his message, Dr. Guo requested clarification of the PIP and the rescission of the CAP. Mr. McIntosh responded that the team was investigating his complaint that the PIP was retaliatory but that in the meantime, the PIP was active.

122. Dr. Guo responded to request information on the company's policies regarding the maintenance of a PIP while it was under investigation as retaliatory conduct.

123. The next day, Mr. McIntosh replied and provided that there was no company policy that stated that a PIP must be halted while it was under investigation.

124. On March 19, 2025, Dr. Guo emailed Ms. Wallace to follow up on his formal challenge to the PIP, as he had not yet been contacted by HR.

125. Later that day, Ms. Whitehead emailed Dr. Guo and asked him to provide specific examples of which areas of the PIP he disputed and reminded him that he was still expected to meet with Dr. Cisar regarding his performance.

126. Dr. Guo responded that he had asked for clarification and information on the investigation into his complaints, the PIP, the rescission of the CAP, and the company's policies on multiple occasions but had yet to receive a response or any information about the investigation.

127. Whereas the investigation that allegedly led to the CAP and PIP had been approved with no prior notice. Dr. Guo therefore asked for a timeline of when he might receive a response.

128. Ms. Whitehead responded on March 20, 2025, that she expected the investigation to be completed by March 28, 2025.

129. Ms. Whitehead also stated that Dr. Guo was not entitled to the information he had requested.

130. On or about March 25, 2025, Dr. Guo participated in a second Performance Improvement Plan ("PIP") progress meeting attended by Dr. Cisar, Mr. Peat, and Ms. Wallace.

131. As directed by Dr. Cisar, Dr. Guo submitted a comprehensive, evidence-based update on March 27, 2025.

132. This submission was supported by objective data, internal documentation, contemporaneous meeting notes, and witness corroboration.

133. It conclusively demonstrated that the assigned goals and objectives were arbitrary, operationally unattainable, and misaligned with Dr. Guo’s Senior Scientist responsibilities.

134. Dr. Guo further refuted Dr. Cisar’s mischaracterizations of his performance as factually baseless and indicative of discriminatory and retaliatory bias.

135. Rather than address these substantive concerns, Dr. Cisar retaliated by issuing a "super urgent" demand on March 27, 2025, imposing a 48-hour deadline expiring at 5:00 p.m. on Saturday, March 29th.

136. This communication fraudulently attributed to Dr. Guo a statement he never made, alleging that he claimed deliverables were "not appropriate for a Senior Scientist."

137. This message from Dr. Cisar culminated in a threat to "explore [his] transition from [his] role."

138. Dr. Guo immediately escalated this fabrication to Ms. Whitehead, copying Dr. Cisar and senior leadership, including Emma Parmee and Louis Lombardo.

139. Dr. Guo expressed he was seeking clarification and an extension pending Employee Relations' guidance.

140. Ms. Whitehead acknowledged receipt and stated she was not sure what Dr. Cisar was asking, but she promised to follow up with Dr. Cisar and get back to Dr. Guo.

141. On or about March 31st, Ms. Whitehead confirmed that she had discussed the foregoing with Dr. Cisar and stated, "I know what he was asking. It's pretty clear. I cannot tell you what to say."

142. In this way, she abruptly changed course and shirked any responsibility to address the issues Dr. Guo had raised.

143. Dr. Guo discovered on April 1, 2025, that two formal complaints he had filed with the Janssen Ethics Committee had been reassigned to Ms. Whitehead.

144. The following day, automated system notifications confirmed Ms. Whitehead had summarily closed nearly all complaints Dr. Guo filed against Dr. Cisar since February 20, 2025, without investigation or resolution.

145. At the same time, Dr. Guo's new submission of cases was immediately closed by Ms. Whitehead.

146. Dr. Guo scheduled a meeting on April 4, 2025, with Ms. Whitehead to discuss her purported investigation.

147. However, prior to the meeting with Ms. Whitehead, Dr. Guo was required to attend an 11:00 a.m. PIP meeting on April 4, 2025, with Dr. Cisar, Mr. Peat, Ms. Wallace, and Scott Kuduk.

148. Instead, at the meeting, Dr. Cisar suddenly announced Dr. Guo's immediate termination and declared the decision "final."

149. In response, Dr. Guo challenged the termination's validity and particularly noted the active PIP and unresolved retaliation investigation, but Dr. Cisar and Mr. Peat dismissed his inquiries, stating, "arguments are not important now."

150. Dr. Cisar then demanded Dr. Guo surrender his company badge and vacate the premises.

151. Dr. Guo was extremely upset and as he stood, he was visibly unsteady.

152. Ms. Wallace noted his condition and said, "Dr. Guo, you should sit down now as your body is swaying,"

153. Dr. Cisar instead insisted he "go and collect [his] stuff now."

154. Under this extreme stress, Dr. Guo collapsed. Emergency medical services were called and emergency personnel transported Dr. Guo to Jefferson Health, where physicians diagnosed a panic attack induced by extreme stress, a suspected left knee injury, and cardiac symptoms requiring ongoing care. Dr. Guo is responsible for a Jefferson Health emergency department bill of $1,507 as a result of the extreme stress caused by Defendant's conduct in discriminating against, harassing and retaliating against Dr. Guo. Dr. Guo's personal eyeglasses/sunglasses were withheld from him and have never been returned.

155. Beginning on April 14, 2025 — ten days after his termination — and continuing through September 2, 2025, Dr. Guo underwent approximately fifteen therapy sessions with his

treating therapist for the emotional distress caused by Defendants' discrimination, harassment, retaliation and his termination, including the events of April 4, 2025.

156. Dr. Guo remains under medical supervision and treatment for acute anxiety, depression, and other injuries directly attributable to Defendants' retaliatory and discriminatory conduct.

157. Any attempt to claim that Dr. Guo had "low productivity" or was uncooperative is undercut by his documented performance record. In 2024, Dr. Guo submitted 186 compounds. Dr. Cisar approved Dr. Guo's 2025 goals and objectives at the start of 2025.

158. Any attempt to mischaracterize two conversations that occurred on February 6, 2025 as alleged performance warnings is misplaced and merely an after-the-fact effort to justify Defendant's overt discrimination and retaliation. The two February 6th discussions were routine project discussions and Dr. Guo is aware of no documentation from at or around the time of those discussions describing those discussions as warnings of any kind.

159. Dr. Guo's termination appears to be consistent with a pattern of employees in Discovery Chemistry and in Dr. Kuduk's reporting line.

160. More specifically, from 2020 to 2025, at least four Chinese scientists in Discovery Chemistry were placed on unwarranted Performance Improvement Plans. In the past approximately three to four years, Dr. Guo is the third Chinese and Asian scientist in Dr. Kuduk's reporting line, along with Haiyan Bian and Aihua Wang, to have been terminated.

161. Dr. Guo believes that he and the other two Chinese scientists were the only scientists under Dr. Kuduk to have been fired, as opposed to laid off during that same time period.

162. The fourth Chinese scientist placed on a Performance Improvement Plan in Discovery Chemistry during the 2020–2025 period, computational chemist Zhijie Liu, was not in Dr. Kuduk's reporting line. Dr. Liu survived his Performance Improvement Plan and was not separated. Upon information and belief, each of the three Chinese scientists within Dr. Kuduk's reporting line who was placed on a Performance Improvement Plan — Dr. Bian, Dr. Wang, and Dr. Guo— was separated from the Company.

163. Upon information and belief, of the approximately fifteen scientists of Chinese origin employed in Discovery Chemistry during this period, nearly all have since departed the Company. The personnel records reflecting the race and national origin of Discovery Chemistry scientists, and their placements on performance improvement plans, promotions, and separations, are in Defendant's exclusive possession, custody, and control.

164. In the Position Statement Defendant Janssen submitted to the EEOC in response to Plaintiff's EEOC Charge, Defendant represented that Haiyan Bian and Aihua Wang were employed in other departments. That representation was false. Dr. Wang was a Senior Scientist in Discovery Chemistry who reported directly to Dr. Kuduk, and Dr. Bian was a scientist in Discovery Chemistry who reported to a Principal Scientist within Dr. Kuduk's organization. Both were placed on Performance Improvement Plans and separated from the Company. Plaintiff expects Defendant's own personnel records, to be produced in discovery, to confirm these reporting lines.

165. Additionally, Dr. Guo has significant concerns as he has learned that his employment and termination may be being communicated to prospective employers in an untrue and negative light, resulting in difficulty with Dr. Guo finding a new position and damage to his reputation.

166. Given his treatment during his employment with Janssen, and the circumstances surrounding his termination, Dr. Guo maintains that he was subjected to discrimination and harassment on the basis of his race and national origin, retaliation for complaining about discrimination and harassment, and that his termination was a result of illegal discrimination and retaliation.

167. Dr. Guo filed no less than seven internal complaints raising concerns of discrimination, harassment and retaliation – five through Employee Relations and another two through EthicsPoint. Each was closed without findings and any alleged investigation was flawed, lacking, or non-existent, and appears to have been purposely designed to conclude that no wrongdoing had occurred.

168. Dr. Guo has suffered and continues to suffer mental anguish and severe emotional distress as a direct and proximate result of the actions and inactions of Defendants.

169. Defendant Janssen and its employees acted with the intent of causing, or in reckless disregard of the probability that their actions would cause, Dr. Guo severe emotional distress.

170. Dr. Guo has suffered financial and other losses including, among other things, lost wages, and an obligation for attorneys' fees and costs of bringing suit as a direct and proximate result of the actions and inactions of Defendants.

## COUNT I
**Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), et seq.**
**(Plaintiff v. Defendant Janssen)**

171. Plaintiff Boying Guo repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

172. Based on the foregoing, Defendant engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

173. In discriminating against and harassing Dr. Guo because of his race and national origin, and in retaliating against Dr. Guo for complaining about discrimination and harassment, Defendant Janssen violated Title VII.

174. Defendant Janssen's violations were intentional and willful.

175. Defendant Janssen's violations warrant the imposition of punitive damages.

176. As a direct result of the unlawful employment practices engaged in by Defendant Janssen, Plaintiff Boying Guo has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

177. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant Janssen's actions unless and until this Court grants the relief requested herein.

## COUNT II
**Civil Rights Act of 1866, 42 U.S.C. § 1981**
**(Plaintiff v. All Defendants)**

178. Plaintiff Boying Guo repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

179. Based on the foregoing, Defendants engaged in unlawful employment practices in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981").

180. In discriminating against and harassing Dr. Guo on the basis of his race, and in retaliating against Dr. Guo for his complaints about discrimination and harassment, Defendants violated Section 1981.

181. Defendants' violations were intentional and willful.

182. Defendants' violations warrant the imposition of punitive damages.

183. As a direct result of the unlawful employment practices engaged in by Defendants, Plaintiff Boying Guo has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

184. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendants' actions unless and until this Court grants the relief requested herein.

**COUNT III**
**The Pennsylvania Human Relations Act, 43 P.S. § 951, et seq.**
**(Plaintiff v. All Defendants)**

185. Plaintiff Boying Guo repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

186. Based on the foregoing, Defendants engaged in unlawful employment practices in violation of the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq.

187. In discriminating against and harassing Dr. Guo on the basis of his race and national origin, and in retaliating against Dr. Guo for his complaints about discrimination and harassment, Defendant Janssen violated the Pennsylvania Human Relations Act.

188. Dr. Cisar aided and abetted Janssen's discrimination, harassment and retaliation as alleged herein.

189. In aiding and abetting Janssen's discrimination, harassment and retaliation, Dr. Cisar violated the Pennsylvania Human Relations Act.

190. As the direct and proximate result of the aforesaid unlawful employment practices engaged in by Defendants, Plaintiff Boying Guo has sustained a loss of earnings and earning potential, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

191. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendants' actions and inactions unless and until this Court grants the relief requested herein.

## PRAYER FOR RELIEF

192. Plaintiff Boying Guo repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Boying Guo respectfully requests that this Court enter judgment in his favor and against Defendants, and Order:

a. Appropriate equitable relief, including reinstatement or front pay;

b. Defendants compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to unlawful discrimination, harassment and retaliation;

c. Defendants pay Plaintiff punitive damages;

d. Defendants pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

e. Defendants pay Plaintiff's costs of bringing this action, including, but not limited to, Plaintiff's reasonable attorneys' fees;

f. Plaintiff be granted any and all other remedies available pursuant to Title VII, Section 1981, the PHRA, and/or any other applicable law; and

g. Such other and further relief as is deemed just and proper.

**JURY DEMAND**

Plaintiff hereby demands trial by jury as to all issues so triable.

*/s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
One Penn Center
1617 JFK Blvd. – Suite 1254
Philadelphia, PA 19103

*Attorneys for Plaintiff Boying Guo*

Dated: November 2, 2026